T.C. Memo. 2009-27

UNITED STATES TAX COURT

CORA TAYLOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12424-05L, 14765-07L.     Filed February 5, 2009.

<u>Robert E. McKenzie</u> and <u>Kathleen M. Lach</u>, for petitioner.

<u>Gregory J. Stull</u> and <u>Gorica B. Djuraskovic</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  In these consolidated cases petitioner, pursuant to sections 6320[1] and 6330, seeks a review of two notices of determination in which respondent determined that

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

collection actions could proceed with respect to petitioner's unpaid Federal income tax liabilities. In docket No. 12424-05L (the lien case), petitioner alleges that respondent abused his discretion in determining that the filing of a notice of Federal tax lien (NFTL) regarding petitioner's unpaid income tax liabilities for 1998, 2000, and 2001 (unpaid tax liabilities) was appropriate. In docket No. 14765-07L (the levy case), petitioner alleges that respondent abused his discretion in determining that collection of petitioner's unpaid tax liabilities for 1998 and 2000 could proceed by levy. In both cases petitioner contends that respondent erred (1) by not accepting petitioner's offer-in-compromise (OIC) on grounds of effective tax administration, (2) by denying petitioner's request for the abatement of section 6651(a)(2) additions to tax assessed with respect to 1998, 2000, and 2001, and (3) by determining that the collection action was appropriate.

FINDINGS OF FACT

Petitioner is a well-known musical and recording artist who performs under the name of Koko Taylor. Petitioner, who is 80 years old, resides in Illinois. Petitioner is married and filed her Federal income tax returns for 1998, 2000, and 2001 using a filing status of married filing separately.

Petitioner's Professional Career and Medical Condition

Petitioner is a professional blues singer who is sometimes called "Queen of the Blues".  Her performing career spans five decades.

Petitioner was born into a poor family on a farm in Tennessee and was orphaned at an early age.  She received only a few years of formal schooling.  In her early twenties petitioner moved to Chicago, where she worked cleaning houses.

Petitioner started her singing career by singing blues in Chicago night clubs.  Her big break came in 1962 when an arranger and composer named Willie Dixon discovered her.  He helped petitioner get a recording contract and produce several singles, including the hit "Wang Dang Doodle", and two albums.

Petitioner went on to become a very successful blues singer. During her career she released 12 albums, one completed sometime around 2007.  Petitioner has received two Grammy Awards and has been nominated for eight.  She has also received 24 W.C. Handy Awards, among many other awards, and in 2004 she was a recipient of the National Heritage Fellowship of the National Endowment for the Arts.

In December 2001 petitioner had her first heart attack. After the heart attack, she was hospitalized for approximately 9 days.  During the hospitalization stents were inserted into her arteries.  Petitioner began to perform again in February 2002.

In October 2003 petitioner suffered a second heart attack. She underwent coronary bypass surgery. Following the surgery, petitioner developed abdominal bleeding, resulting in additional surgery. After the second heart attack she did not perform again until spring of 2004. Petitioner also suffers from high blood pressure and diabetes and must take insulin three times daily.

Petitioner's Unpaid Tax Liabilities for 1998, 2000, and 2001

Petitioner timely filed her 1998 Form 1040, U.S. Individual Income Tax Return (1998 return), on or about October 14, 1999, pursuant to extensions. Petitioner reported an income tax liability of $136,382, no estimated tax payments, and a section 6654(a) addition to tax of $4,914. Petitioner also claimed a credit for tax withheld of $1,486, and she remitted a $60,000 payment with the 1998 return.

On December 6, 1999, respondent assessed an income tax liability of $136,382, as reported on the 1998 return. Respondent also assessed a section 6651(a)(2) addition to tax of $4,796 for failure to pay timely the tax shown on the 1998 return and a section 6654(a) addition to tax of $4,914. Respondent applied the credit for the $1,486 of tax withheld and the $60,000 payment petitioner remitted with her 1998 return against the assessed amount. From February 23, 2000, through June 21, 2002, petitioner made installment payments of approximately $1,550 per month on her 1998 unpaid tax liability.

On or around October 15, 2001, petitioner filed a timely 2000 Form 1040 (2000 return), pursuant to extensions. On the 2000 return, petitioner reported an income tax liability of $143,097 and no estimated tax payments, and she claimed a credit for tax withheld of $1,723. She did not send any payment with the 2000 return.

On November 26, 2001, respondent assessed the income tax reported on petitioner's 2000 return, a section 6651(a)(2) addition to tax of $5,655, a section 6654(a) addition to tax of $7,032, and interest. Respondent credited the tax withheld against the assessed amounts.

At some point before February 2002, respondent selected petitioner's 1998 return for examination. The parties resolved the examination by agreement. On or about February 18, 2002, respondent assessed a $15,880 income tax deficiency for 1998 in accordance with Form 4549, Income Tax Examination Changes, dated November 26, 2001, which petitioner signed, and interest.

On or about February 25, 2002, petitioner filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 2000, claiming an overpayment of $19,293 resulting from a passive loss carryover from 1998. On August 19, 2002, respondent credited the overpayment to petitioner's unpaid 2000 tax liability.

On or about August 16, 2002, petitioner filed a timely 2001 Form 1040 (2001 return), pursuant to extensions. Petitioner

reported income tax due of $88,591 and no estimated tax payments, and she claimed a credit for tax withheld of $1,610. Petitioner did not send any payment with the 2001 return.

On September 23, 2002, respondent assessed the tax liability reported on petitioner's 2001 return. Respondent also assessed a section 6651(a)(2) addition to tax of $2,609, a section 6654(a) addition to tax of $3,435, and interest. Respondent credited the tax withheld against the assessed amounts.

Petitioner's Compliance History After 2001

For 2002, 2003, and 2004 petitioner timely filed her Federal income tax returns and paid all taxes due for those years. However, with respect to 2005, petitioner did not timely pay her entire tax liability either through estimated tax payments or at the time she filed her return. On November 6, 2006, petitioner submitted an $8,515 payment for application to her 2005 tax liability, but the check was returned for insufficient funds. For 2006 petitioner made no estimated tax payments.

Petitioner's Performances and Income During 2002-06

During 2002-06, despite her health problems, petitioner continued to perform at events in the United States and abroad. In 2003, 2004, and 2005 petitioner performed at 54, 21, and 27 events, respectively. From January 15 through September 3, 2006, petitioner performed at 18 shows, and she was still performing in 2007.

Petitioner reported on her Federal income tax returns gross receipts from performances and adjusted gross income as follows:

| Year | Gross receipts from performances[1] | Adjusted gross income |
|------|-------------------------------------|-----------------------|
| 2002 | $415,875 | $308,411 |
| 2003 | 488,750 | 268,369 |
| 2004 | 233,250 | 161,759 |
| 2005 | 326,800 | 166,365 |

[1]Petitioner's gross receipts from performances reflect the income from her performances as reported on a statement attached to her returns. Petitioner's gross receipts or sales reported on her 2002 and 2004 Schedules C, Profit or Loss From Business, are higher amounts than her gross receipts from performances in those years.

Respondent's Collection Actions in the Lien Case

On December 13, 2002, respondent sent an NFTL with respect to petitioner's unpaid tax liabilities for 1998, 2000, and 2001 to the Office of Recorder of Deeds, Cook County, Illinois. On December 18, 2002, respondent mailed a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 to petitioner by certified mail. On January 9, 2003, petitioner, through her counsel, submitted to respondent a timely Form 12153, Request for a Collection Due Process Hearing, with respect to the NFTL. In the request, petitioner contended that (1) the filing of the NFTL adversely affects her credit rating, business activities, and ability to secure financing; (2) she is entitled to an abatement of the addition to tax for failure to pay because she has reasonable cause for not paying her taxes; (3) she is entitled to an OIC based on inability to pay, doubt as to liability, and

effective tax administration; and (4) if she is not granted an OIC, she is entitled to an installment agreement.

On or about January 21, 2003, petitioner submitted to respondent a $150,000 OIC dated November 18, 2002[2] (OIC I), seeking to settle her unpaid tax liabilities on the ground of effective tax administration.  Respondent returned OIC I to petitioner for clarification of certain information.

Respondent referred petitioner's request for a section 6320 hearing regarding the NFTL filing to the Appeals Office in Chicago, Illinois.  Petitioner's case was assigned to Settlement Officer Paul Lewis (Settlement Officer Lewis).

On March 26, 2003, petitioner's counsel sent to Settlement Officer Lewis a letter and copy of OIC I that had previously been submitted to respondent and returned to petitioner.  On July 28, 2003, Settlement Officer Lewis approved OIC I for consideration, and on or about August 19, 2003, OIC I was referred to respondent's OIC group for investigation.

On or about September 15, 2003, an OIC specialist requested additional information from petitioner regarding OIC I. Specifically, the OIC specialist requested a copy of petitioner's 2002 tax return and proof that petitioner made 2003 estimated tax payments.  The OIC specialist determined that petitioner had paid

---

[2]The parties incorrectly stipulated that the OIC was dated Nov. 12, 2002.

only $20,000 towards her 2003 estimated tax liability and that she owed an additional $54,250. Petitioner's counsel responded to the OIC specialist's inquiry, explaining that petitioner had received an extension for filing her 2002 return and that a copy would be forwarded when completed. She also explained that petitioner had made another payment of $25,000 towards her 2003 estimated tax liability but that petitioner anticipated her 2003 earnings would be significantly reduced because of her health condition. On or around November 20, 2003, petitioner submitted a copy of her 2002 return to Settlement Officer Lewis.

In March 2004 the OIC specialist returned OIC I to Settlement Officer Lewis with a recommendation that OIC I be rejected.[3] The OIC specialist calculated petitioner's reasonable collection potential and determined that petitioner's income was sufficient to satisfy her unpaid tax liabilities within a reasonable time without causing undue hardship. The OIC specialist also explained that petitioner's medical condition was not extraordinary for a person her age and did not appear to affect her income.

On or about April 7, 2004, Settlement Officer Lewis sent petitioner's counsel a letter enclosing copies of an Income Expense Table (IET) and an Asset Equity Table (AET) prepared by

---

[3]In the recommendation report, the OIC specialist noted that petitioner was in current compliance with all estimated tax obligations.

the OIC specialist.  The letter stated that the IET and AET showed that petitioner had the ability to resolve her liabilities without an OIC, that her age was considered, and that petitioner's counsel could discuss the calculations or an installment agreement for petitioner.  On July 1 and 22, 2004, petitioner's counsel wrote to Settlement Officer Lewis regarding the "other expenses" and royalties listed in OIC I, explaining that the "other expenses" included attorney's and accountant's fees and that petitioner's royalties in 2003 were approximately $22,000.

During the OIC negotiations petitioner proposed to increase the amount offered in OIC I to $200,000 with a future income collateral agreement (OIC II).  Settlement Officer Lewis sent a letter dated August 9, 2004, to petitioner's counsel acknowledging petitioner's proposal and requesting additional verification of the "other expenses" claimed in OIC I.  He also informed petitioner's counsel that petitioner's medical documentation did not describe a significant health problem for someone of petitioner's age.  In response, petitioner's counsel sent copies of invoices regarding legal fees petitioner paid for her representation and a copy of a letter from petitioner's physician dated October 11, 2004, regarding petitioner's medical condition.  Petitioner also submitted a copy of her 2003 Form 1040 (2003 return).

Petitioner's counsel continued to communicate with Settlement Officer Lewis regarding an OIC. In response to requests by Settlement Officer Lewis, petitioner's counsel provided documentation of petitioner's performance schedule and additional information from petitioner's physician. Petitioner's counsel also sent Settlement Officer Lewis a copy of petitioner's 2004 Form 1040.

In 2005 respondent began an examination of petitioner's 2003 return (2003 examination). By letter dated May 27, 2005, Settlement Officer Lewis informed petitioner that her OIC could not be considered because of the pending 2003 examination and that she could resubmit an OIC through the normal processing procedures after the audit was resolved.

On June 7, 2005, respondent's Appeals Office mailed petitioner a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330, sustaining respondent's filing of the NFTL. The attachment to the notice of determination explained that petitioner raised the following issues in the hearing: (1) The NFTL would adversely affect her credit rating and hinder her business activities, (2) petitioner is entitled to an abatement of penalties, (3) petitioner requests an OIC, and (4) petitioner requests an installment agreement. The attachment stated that petitioner presented no evidence that the NFTL would hinder her business activities or that she had

reasonable cause for the abatement of penalties.  The attachment also stated that petitioner was advised that she could resubmit her OIC after the audit was resolved and that she was not eligible for an installment agreement because her tax liabilities could be satisfied by liquidating her assets.

Petitioner filed a timely petition under section 6320 contesting respondent's determination in the lien case.

On October 12, 2005, respondent notified petitioner by letter of no changes to petitioner's 2003 return.  On September 13, 2006, a trial was held in the lien case.

Respondent's Collection Actions in the Levy Case

On or about August 6, 2002, respondent sent petitioner a Final Notice of Intent to Levy and Notice of Your Right to a Hearing with respect to petitioner's unpaid 1998 and 2000 tax liabilities.  Petitioner, through an authorized representative, submitted a timely Form 12153 contesting the proposed levy.

Respondent assigned petitioner's levy case to Settlement Officer Mary McHugh (Settlement Officer McHugh).  On or about November 16, 2006, Settlement Officer McHugh sent petitioner and her counsel a letter acknowledging receipt of petitioner's request for a hearing and explaining the hearing process.  The letter stated:

> Appeals cannot approve an installment agreement or accept an offer-in-compromise unless all required estimated tax payments for the current year's income tax liability have been made.  If you wish to pursue

one of these alternatives during the * * * [collection due process] hearing process, you must arrange for the payment of any required estimated tax payments. <u>Delinquent estimated tax payments can be included in an installment agreement.  However, the estimated tax payments must be paid in full before an offer-in-compromise can be accepted</u>.  Our records indicate that you have not made estimated tax payments for the following period(s):  2006.

Settlement Officer McHugh requested that petitioner submit a completed Collection Information Statement (Form 433-A for individuals and/or Form 433-B for businesses) with verification and required attachments and proof of estimated tax payments for 2006.  Settlement Officer McHugh scheduled a hearing for January 9, 2007.

On or about December 21, 2006, petitioner's counsel submitted to respondent a Form 656, Offer in Compromise, that was marked "AMENDED" (OIC III) for consideration in connection with the hearing.  OIC III included a cash offer of $125,000 and a collateral agreement to pay a percentage of annual net income that exceeded $125,000.  Petitioner attached to the Form 656 an explanation of her circumstances that was almost identical to the one attached to OIC I submitted in the lien case.  Petitioner also submitted a Form 2261, Collateral Agreement, and Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals.  On the Form 433-A, petitioner reported the following monthly income and expenses:

| Income | | Living expenses | |
| --- | --- | --- | --- |
| Source | Gross monthly | Expense items | Gross monthly |
| Wages | $1,259 | Food, clothing, misc. | $1,500 |
| Net income from business | 11,813 | Housing and utilities | 1,400 |
| | | Transportation | 500 |
| Pension/Social Security | 1,500 | Health care (estimate) | 500 |
| | | Taxes (income and FICA) | 5,000 |
| Other Royalties | 140 | Life insurance | 400 |
| | | Other secured debt (credit cards) | 600 |
| Total | 14,712 | Other expenses[1] | 3,000 |
| | | Total[2] | 12,400 |

[1]Other expenses include average legal and accounting fees of $2,000 and an estimate of other household expenses of $1,000.

[2]The total amount of living expenses should be shown as $12,900.

Petitioner also gave Settlement Officer McHugh a copy of an appraisal prepared by Rick Hiton & Associates, dated March 1, 2000, valuing petitioner's personal residence at $215,000 and additional documentation of her assets, liabilities, income, and expenses, including various Explanation of Benefits forms from Blue Cross/Blue Shield of Illinois, a Medicare Summary Notice, a copy of a matter ledger card from the law firm representing petitioner, and several months of bank account statements for each of petitioner's bank accounts.

After reviewing the documentation petitioner submitted and petitioner's financial status, Settlement Officer McHugh prepared a draft IET and AET to determine petitioner's reasonable collection potential. Settlement Officer McHugh determined that petitioner had $6,094 of monthly disposable income available to satisfy her tax liabilities and $306,242 of equity in assets. The draft IET and AET showed the following:

IET

| Income | Claimed | Appeals |
|--------|---------|---------|
| Gross wages | $1,259 | $1,259 |
| Royalties | 140 | 140 |
| Social Security | 1,500 | 1,500 |
| Income from business | 11,813 | 11,813 |
| Total | 14,712 | 14,712 |

| Expenses | | |
|----------|---------|---------|
| National Standard | $1,500 | $916 |
| Housing & utilities | 1,400 | 1,375 |
| Housing & utilities | 1,000 | -0- |
| Transportation-- | | |
|   operating costs | 500 | 327 |
| Taxes (on income) | 5,000 | 5,000 |
| Health care expenses | 500 | 500 |
| Life insurance | 400 | -0- |
| Other expenses: | | |
|   Credit cards | 600 | -0- |
|   Legal/accounting | 2,000 | 500 |
|     Total | 12,900 | 8,618 |

| Monthly disposable income | 1,812 | 6,094 |
|----------|---------|---------|

AET

| Asset description | Fair market value | Percentage RED[1] | QS Value[1] | Collect Equity[1] |
|---|---|---|---|---|
| Checking acct. | $549 | --- | --- | $549 |
| Savings acct. | 14,672 | --- | --- | 14,672 |
| Life insurance value | 3,651 | --- | --- | 3,651 |
| Real estate (Residence) | 302,523 | 20 | $242,018 | 242,018 |
| Household goods | 15,000 | 20 | 12,000 | 4,280 |
| Vehicle 1 | 7,000 | 20 | 5,600 | 5,600 |
| Vehicle 2 | 11,000 | 20 | 8,800 | 8,800 |
| Vehicle 3 | 7,000 | 20 | 5,600 | 5,600 |
| Hummer[2] | 26,340 | 20 | 21,072 | 21,072 |
| Total | | | | 306,242 |

[1]We understand these captions to mean quick sale reduction percentage, quick sale value, and realizable equity, respectively.

[2]Petitioner did not disclose the Hummer on her Form 433-A. Settlement Officer McHugh determined that a 2006 Hummer H3 SUV 4-Door Wagon Sport Utility was registered under petitioner's name. Settlement Officer McHugh used the Kelly Blue Book to determine the value of the vehicle in "good" condition and included its value in the AET.

On January 9, 2007, a hearing was held in the levy case. Settlement Officer McHugh and petitioner's counsel discussed whether one of petitioner's counsel had orally withdrawn petitioner from the section 6330 hearing process in the levy case. The parties agreed that because there was no written withdrawal, petitioner was entitled to a hearing in the levy case. They also discussed whether OIC III was a new OIC or an amended OIC. Petitioner's counsel suggested that OIC III be treated as an amended OIC because only one OIC should be in

process.  Settlement Officer McHugh agreed but stated that she would consult counsel.[4]

Settlement Officer McHugh next explained that she calculated petitioner's reasonable collection potential using 3 years of income and that it was greater than petitioner's tax liabilities.[5]  Settlement Officer McHugh told petitioner's counsel that petitioner was not a candidate for an effective tax administration OIC because petitioner did not have any hardship. Settlement Officer McHugh explained that petitioner was able to meet her normal living expenses using her Social Security income and income from her music ventures.  When petitioner's counsel asked about the collateral agreement, Settlement Officer McHugh responded that an OIC is generally considered without regard to a collateral agreement.  She explained that a collateral agreement is used when there is a strong likelihood that a taxpayer's income will increase in the future and that that was not the case with petitioner.

Settlement Officer McHugh also informed petitioner's counsel that petitioner was not in current compliance with her tax payment obligations because the check for petitioner's 2005 tax

---

[4]On a later telephone conference call among respondent's counsel, the Appeals Office, and petitioner's counsel, it was decided that OIC III would be treated as an amended OIC.

[5]As of Sept. 5, 2006, petitioner's tax liabilities for 1998, 2000, and 2001 totaled $296,666.

liability had been returned and petitioner had not made any of her required 2006 estimated tax payments. Settlement Officer McHugh requested that petitioner make those payments by January 19, 2007.[6]

On January 9, 2007, the same day as the hearing, Settlement Officer McHugh faxed petitioner's counsel a copy of her draft IET and AET. By letter dated January 19, 2007, petitioner objected to several of Settlement Officer McHugh's findings in the IET and AET. With respect to the IET, petitioner made the following objections: (1) Her income from business should not be included in her future income; (2) her actual expenses, and not the amounts permitted under National and Local Standards, should be allowed;[7] (3) the expense for life insurance should be allowed because the value of the policy was included in the AET; and (4) legal and accounting fees incurred should be allowed. With respect to the AET, petitioner objected to the value used for her residence and the inclusion of the Hummer. Petitioner requested additional time to obtain an appraisal of her residence.

---

[6]During the hearing, Settlement Officer McHugh and petitioner's counsel also discussed the Hummer vehicle and petitioner's daughter's income, both of which were not included on petitioner's Form 433-A. Settlement Officer McHugh explained that because petitioner's daughter lives with petitioner, the daughter's income should increase the monthly payment amounts.

[7]National Standards include living expenses for clothing, food, housekeeping supplies, personal care products, and miscellaneous. Local Standards include living expenses for housing and utilities and for transportation.

Petitioner also noted that she could borrow only approximately $100,000 against the residence and that anything above that amount was irrelevant as to whether an effective tax administration OIC should be accepted.

Petitioner enclosed with the January 19, 2007, letter an $8,515 check for her 2005 tax liability and an $8,000 check for her 2006 estimated tax liability. Each payment, however, was insufficient to fully satisfy the liability. Settlement Officer McHugh notified petitioner's counsel by telephone that the payments were insufficient,[8] and she gave petitioner until February 15, 2007, to pay the remaining tax liabilities.

On or around February 15, 2007, petitioner paid another $441 to satisfy the remaining 2005 tax liability. However, petitioner did not make another payment towards her 2006 estimated tax liability. In a letter to respondent, petitioner's counsel indicated that petitioner's income had declined in 2006, that petitioner did not yet have an income projection, and that petitioner intended to satisfy her 2006 tax liability by

---

[8]Settlement Officer McHugh also notified one of petitioner's counsel by telephone that her research indicated that the Hummer was registered in petitioner's name. After petitioner's counsel suggested that petitioner's granddaughter drives the Hummer, Settlement Officer McHugh requested verification that petitioner's funds were not used to purchase it. However, petitioner never provided the requested verification. They also discussed the value of petitioner's residence, and petitioner's counsel stated that she did not dispute Settlement Officer McHugh's valuation.

April 15, 2007.  Petitioner's counsel attached to the letter an appraisal dated February 14, 2007, from an Internet Web site that valued petitioner's residence at $279,132.

On February 22, 2007, another hearing was held.  Settlement Officer McHugh began by explaining that petitioner was not in current compliance with her 2006 estimated tax obligations.  She also explained that even if petitioner were in current compliance, OIC III would not be acceptable on the grounds of effective tax administration because petitioner's circumstances did not present any hardship.

The parties also discussed the possibility of an installment agreement.  Settlement Officer McHugh explained that in order for petitioner to qualify for an installment agreement she should make a significant downpayment based on her home equity and that a reverse mortgage was a possibility.  She also explained that petitioner's monthly disposable income of approximately $6,000, as calculated by Settlement Officer McHugh, would be the amount of her monthly installment payment.  Petitioner's counsel indicated that petitioner would not agree on any of the issues, and Settlement Officer McHugh informed petitioner's counsel that a notice of determination would be issued.

On June 1, 2007, respondent's Appeals Office mailed to petitioner a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 sustaining respondent's

determination to proceed with collection by levy. The attachment to the notice of determination addressed petitioner's objections to the AET and IET calculated by Settlement Officer McHugh. It explained that the value of petitioner's residence was based on a 2000 appraisal applying a 5-percent annual increase in value as suggested by petitioner's counsel. It also explained that an Internet appraisal dated February 14, 2007, did not consider items such as the pool and other property characteristics. The attachment stated that petitioner did not provide the requested verification that she did not use her funds to purchase the Hummer. The attachment explained that Settlement Officer McHugh reduced the expense items in the IET to match the amounts allowed by National and Local Standards. It also noted that the housing and utilities expense should consist of only real estate taxes and utilities and that the amount petitioner claimed was unrealistic. The attachment stated that on the basis of statements of petitioner's legal and accounting fees incurred, petitioner's monthly fees incurred should equal $500 and not $2,000 as petitioner claimed. The attachment also stated that petitioner was not entitled to an abatement of penalties for failure to pay. It explained that petitioner's investment in a local club and her heart attack were not reasonable cause for her failure to pay her taxes.

On June 28, 2007, petitioner timely filed a petition contesting respondent's levy determination.  The parties filed a joint motion to assign the levy case to the same Judge who had conducted the trial in the lien case and a joint motion to submit the levy case to the Court fully stipulated under Rule 122.  At the request of the parties the Court, by order dated February 4, 2008, consolidated the two cases for briefing and opinion and set a briefing schedule.  Both parties filed opening briefs, and petitioner filed an answering brief.

OPINION

I.    Section 6320 and 6330 Hearings

Section 6321 imposes a lien on all property and property rights of a taxpayer liable for taxes where a demand for the payment of the taxes has been made and the taxpayer fails to pay. Section 6320(a) requires the Secretary to send written notice to the taxpayer of the filing of a notice of lien and of the taxpayer's right to an administrative hearing on the matter. Section 6331(a) provides that if any taxpayer liable to pay any tax neglects or refuses to pay such tax within 10 days after notice and demand for payment, then the Secretary is authorized to collect such tax by levy upon the taxpayer's property. Section 6330(a) requires the Secretary to send written notice to the taxpayer of the taxpayer's right to request a section 6330 hearing before a levy is made.

If the person makes a timely request for a hearing under section 6320 (dealing with liens) or section 6330 (dealing with levies), a hearing shall be held by the Internal Revenue Service Office of Appeals. Secs. 6320(a)(3)(B), (b)(1), and (c), 6330(b)(1). Administrative hearings under sections 6320 and 6330 must be conducted in accordance with section 6330(c). Secs. 6320(c), 6330(c).

At the hearing, a taxpayer may raise any relevant issue, including appropriate spousal defenses, challenges to the appropriateness of the collection action, and collection alternatives, such as an OIC or an installment agreement. Sec. 6330(c)(2)(A). Additionally, the taxpayer may contest the validity of the underlying tax liability, but only if the taxpayer did not receive a notice of deficiency or otherwise have an opportunity to dispute the tax liability. Sec. 6330(c)(2)(B). The phrase "underlying tax liability" includes the tax deficiency, any penalties and additions to tax, and statutory interest. Katz v. Commissioner, 115 T.C. 329, 339 (2000).

Following a hearing, the Appeals Office must issue a notice of determination regarding the validity of the filed Federal tax lien or the appropriateness of the proposed levy action. In making a determination, the Appeals Office must take into consideration: (1) The verification presented by the Secretary that the requirements of applicable law and administrative

procedures have been met; (2) the relevant issues raised by the taxpayer; and (3) whether the proposed collection action appropriately balances the need for efficient collection of taxes with a taxpayer's concerns regarding the intrusiveness of the proposed collection action. Sec. 6330(c)(3). If the taxpayer disagrees with the Appeals Office's determination, the taxpayer may seek judicial review by appealing to this Court. Sec. 6330(d). Where the underlying tax liability is properly at issue, the Court reviews any determination regarding the underlying tax liability de novo. Sego v. Commissioner, 114 T.C. 604, 610 (2000). Where the underlying tax liability is not properly at issue, the court will review the administrative determination of the Appeals Office for abuse of discretion. Lunsford v. Commissioner, 117 T.C. 183, 185 (2001); Sego v. Commissioner, supra; Goza v. Commissioner, 114 T.C. 176, 182 (2000). In reviewing for an abuse of discretion, we do not conduct an independent review of whether an OIC submitted by a taxpayer was acceptable or substitute our judgment for that of the Appeals Office. Rather, we must uphold the Appeals Office's determination unless it is arbitrary, capricious, or without sound basis in fact or law. See, e.g., Murphy v. Commissioner, 125 T.C. 301, 320 (2005), affd. 469 F.3d 27 (1st Cir. 2006); Hansen v. Commissioner, T.C. Memo. 2007-56; Catlow v. Commissioner, T.C. Memo. 2007-47.

Section 7122(a) authorizes the Secretary to compromise any civil case arising under the internal revenue laws. Section 7122(c)(1)[9] authorizes the Secretary to prescribe guidelines for officers and employees of the IRS to determine whether an OIC is adequate and should be accepted. The regulations under section 7122 provide that effective tax administration is one ground for the compromise of a tax liability.[10] Sec. 301.7122-1(b)(3), Proced. & Admin. Regs. In order to compromise a tax liability to promote effective tax administration, the Secretary must determine that collection in full could be achieved but that collection in full would cause the taxpayer economic hardship.[11] Sec. 301.7122-1(b)(3)(i), Proced. & Admin. Regs.

Economic hardship exists if satisfaction of the levy in whole or in part would render a taxpayer unable to pay reasonable basic living expenses. Secs. 301.7122-1(b)(3), 301.6343-1(b)(4)(i), Proced. & Admin. Regs. The determination of a

---

[9]In the Tax Increase Prevention and Reconciliation Act of 2005, Pub. L. 109-222, sec. 509, 120 Stat. 362 (2006), Congress redesignated sec. 7122(c) as sec. 7122(d) effective for OICs submitted on and after July 16, 2006.

[10]The other grounds for the compromise of a tax liability are doubt as to liability and doubt as to collectibility. Sec. 301.7122-1(b)(1) and (2), Proced. & Admin. Regs.

[11]A taxpayer and the IRS may not enter into a compromise of a tax liability to promote effective tax administration if compromise of the liability would undermine the taxpayers' compliance with the tax laws. Sec. 301.7122-1(b)(3)(iii), Proced. & Admin. Regs.

reasonable amount for basic living expenses must be made and will vary according to the unique circumstances of the taxpayer. Sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs. Unique circumstances, however, do not include the maintenance of an affluent or luxurious standard of living. Id.

Factors supporting a determination that collection would cause economic hardship include, among others: (1) The taxpayer is incapable of earning a living because of a long-term illness, medical condition, or disability, and it is reasonably foreseeable that the taxpayer's financial resources will be exhausted providing care and support during the course of the condition; and (2) although the taxpayer has certain assets, the taxpayer cannot borrow against the equity in those assets, and liquidation of those assets to pay outstanding tax liabilities would render the taxpayer unable to meet basic living expenses. Sec. 301.7122-1(c)(3)(i), Proced. & Admin. Regs.

A.     Settlement Officer Lewis's Determination in the Lien Case

Petitioner argues that Settlement Officer Lewis abused his discretion in the lien case by returning the OIC[12] because of the pending 2003 examination and thereby prematurely ending the

---

[12]Petitioner orally amended OIC I to include a $200,000 cash payment and collateral agreement (OIC II). Although Settlement Officer Lewis recognized the amendment in a letter to petitioner, the notice of determination is unclear as to whether it was issued with respect to OIC I or II. In any event, this distinction does not affect our decision.

negotiations.  Petitioner contends that her counsel told Settlement Officer Lewis that the issue in the 2003 examination was minor and would be resolved quickly.  Settlement Officer Lewis denies receiving this information.  Nevertheless, Settlement Officer Lewis informed petitioner by letter that she could resubmit an OIC after the 2003 examination was resolved and that a notice of determination would be issued.

Although Settlement Officer Lewis may have abused his discretion by concluding that OIC I or II could not be considered because of the pending 2003 examination, as petitioner contends, we need not decide the issue.  After the notice of determination was issued in the lien case and a trial was held to review the determination, petitioner submitted OIC III, marked "AMENDED", to respondent in the levy case.  Petitioner attached to OIC III an Explanation of Circumstances almost identical to the one submitted with OIC I in the lien case.  During the levy hearing, respondent and petitioner's counsel agreed that OIC III would be treated as an amended OIC.  Because the parties treated OIC III as amending OIC I and OIC II, we conclude that OIC III superseded OIC I and OIC II.  A remand to the Appeals Office for a redetermination regarding OIC I or II would be neither necessary nor productive.

Petitioner further argues that Settlement Officer Lewis abused his discretion by not giving petitioner time to discuss

other collection alternatives such as an installment agreement. We disagree. Several months before the notice of determination was issued, Settlement Officer Lewis sent petitioner's counsel a letter explaining that petitioner could not enter into an installment agreement with respondent until petitioner addressed whether the liquidation of some of her assets was appropriate, as required by Internal Revenue Manual (IRM) pt. 5.14.1.5(6) (Sept. 30, 2004). According to the IRM part cited by Settlement Officer Lewis, a taxpayer does not qualify for an installment agreement if the taxpayer's tax liabilities could be fully or partially satisfied by liquidating assets, unless factors such as advanced age, ill health, or other special circumstances are determined to prevent the liquidation of the assets. Id.

The record does not establish that petitioner ever provided Settlement Officer Lewis any information regarding the liquidation of her assets or whether her circumstances prevented the liquidation of her assets. Moreover, petitioner never submitted a Form 433-D, Installment Agreement, or any other document requesting an installment agreement in the lien case. Because petitioner failed to provide the information necessary for Settlement Officer Lewis to consider an installment agreement, as requested, we cannot conclude that Settlement Officer Lewis's decision to close the lien case without considering whether petitioner qualified for an installment

agreement was an abuse of discretion.  Accordingly, we sustain respondent's determination that the NFTL filing was an appropriate enforcement action with respect to petitioner's unpaid tax liabilities.  See Kindred v. Commissioner, 454 F.3d 688, 695-698 (7th Cir. 2006); Orum v. Commissioner, 412 F.3d 819 (7th Cir. 2005), affg. 123 T.C. 1 (2004).

B.    Settlement Officer McHugh's Determination in the Levy Case

Petitioner argues that Settlement Officer McHugh abused her discretion by rejecting petitioner's OIC in that she failed to balance petitioner's legitimate needs with the necessity of efficient collection.  Petitioner also contends that Settlement Officer McHugh abused her discretion in failing to consider the facts of the case, such as the amount of the OIC, petitioner's health, and her limited resources.

In the attachment to the notice of determination, two reasons were cited for Settlement Officer McHugh's rejection of OIC III:  (1) Petitioner was not in current compliance with her 2006 estimated tax liability, and (2) petitioner was not entitled to an effective tax administration OIC because she had the ability to satisfy her unpaid tax liabilities without creating any hardship.  The attachment also stated that a collateral agreement is appropriate only when it is likely that the taxpayer

will have an increase in future income and that petitioner has not shown that such an increase in income is likely.[13]

The IRM, which contains procedures for evaluating OICs, provides that the Commissioner must return an OIC if the taxpayer has not made sufficient estimated tax payments. IRM pt. 5.8.7.2.2.1(1) (Sept. 1, 2005). Before returning an offer for noncompliance, the Appeals Office is instructed by the IRM to determine whether the taxpayer is required to make estimated tax payments, to calculate the amount of estimated tax payments that should have been made, and to contact the taxpayer to explain the noncompliance and request payment. IRM pt. 5.8.7.2.2.1(2) (Sept. 1, 2005). The Appeals officer should give the taxpayer a reasonable deadline for responding, with a warning that the OIC will be returned if payment is not received by the deadline. Id.

Settlement Officer McHugh made at least three requests that petitioner pay her 2006 estimated tax liability and explained that she could not consider OIC III until petitioner complied.

---

[13]The IRM states that securing a collateral agreement should be the exception and not the rule and that a collateral agreement should not be used to accept an offer amount less than the taxpayer's financial condition indicates. IRM pt. 5.8.6.3(1) and (2) (Sept. 1, 2005). It further provides that a future income collateral agreement is appropriate only when a substantial increase in the taxpayer's future income is expected. IRM pt. 5.8.6.3.1(1) (Sept. 1, 2005). Settlement Officer McHugh did not abuse her discretion in determining that the future income collateral agreement petitioner offered did not affect her evaluation of OIC III. Moreover, petitioner never introduced any evidence that a substantial increase in her future income was likely.

Settlement Officer McHugh requested the payment during the January 9, 2007, hearing and gave petitioner until January 19, 2007, to comply. Petitioner submitted an $8,000 payment towards her 2006 estimated tax liability. After Settlement Officer McHugh notified petitioner that the payment was insufficient to satisfy her 2006 estimated tax liability, Settlement Officer McHugh gave petitioner until February 15, 2007, to pay the remaining amount. Petitioner did not submit another payment toward her 2006 estimated tax liability.

Settlement Officer McHugh followed the procedures in the IRM for handling an OIC when the taxpayer is not in current compliance with her estimated tax obligations. She gave petitioner several chances to comply with her required estimated tax payments, but petitioner failed to do so. Consequently, we cannot conclude that Settlement Officer McHugh abused her discretion in rejecting OIC III on the grounds that petitioner was not in current compliance with her 2006 estimated tax liability. See Orum v. Commissioner, supra at 821.

Settlement Officer McHugh also concluded that petitioner did not qualify for an effective tax administration OIC on the grounds of economic hardship. Settlement Officer McHugh determined that petitioner had the ability to satisfy her unpaid tax liabilities without creating economic hardship.

When a taxpayer has sufficient disposable income to satisfy her tax liabilities, an effective tax administration OIC may be appropriate if satisfaction of those liabilities would cause the taxpayer economic hardship.[14]  Sec. 301.7122-1(b)(3)(i), Proced. & Admin. Regs.; see also IRM pt. 5.8.11.2.1(1) (Sept. 1, 2005). The IRM requires that a taxpayer's financial information and special circumstances be examined to determine whether the taxpayer qualifies for an effective tax administration offer on the basis of economic hardship.  IRM pt. 5.8.11.2.1(3) (Sept. 1, 2005).

The regulations and the IRM provide that economic hardship exists only if satisfaction of the taxpayer's tax liabilities would leave the taxpayer unable to pay reasonable basic living expenses.  Secs. 301.7122-(b)(3), 301.6343-1(b)(4)(i), Proced. & Admin. Regs.; IRM pt. 5.8.11.2.1(2) (Sept. 1, 2005).  The IRM states that basic living expenses are those expenses that provide for health, welfare, and production of income of the taxpayer and

_____

[14]A compromise to promote effective tax administration may also be appropriate where compelling public policy or equity considerations identified by the taxpayer provide a sufficient basis for compromising the liability and where, because of exceptional circumstances, collection of the full liability would undermine public confidence that the tax laws are being administered fairly and equitably.  Sec. 301.7122-1(b)(3)(ii), Proced. & Admin. Regs.; see also Speltz v. Commissioner, 124 T.C. 165 (2005), affd. 454 F.3d 782 (8th Cir. 2006).  Petitioner did not argue that her OIC should be accepted on these grounds, nor did she identify any compelling public policy or equity consideration that would provide a sufficient basis for compromising the liability.

the taxpayer's family.  IRM pt. 5.8.11.2.1(4) (Sept. 1, 2005).
It further states that some basic living expenses are limited to
the National Standards while other expenses are limited to Local
Standards, and deviation from those standards is permissible only
if the taxpayer can justify the expenses that exceed those
limits.  IRM pt. 5.8.11.2.1(4) (Sept. 1, 2005).  In addition to
the basic living expenses, the IRM lists several other factors to
consider:  (1) The taxpayer's age and employment status; (2) the
number, age, and health of taxpayer's dependents; (3) the cost of
living in the area where the taxpayer resides; and (4) any
extraordinary circumstances, including a medical catastrophe.
IRM pt. 5.8.11.2.1(5) (Sept. 1, 2005).

Settlement Officer McHugh followed the regulations and IRM
procedures for determining whether petitioner qualified for an
effective tax administration OIC based on economic hardship.
Settlement Officer McHugh calculated petitioner's reasonable
collection potential using the information petitioner provided on
the Form 433-A and elsewhere and determined that petitioner had
approximately $6,000 of disposable monthly income that could be
used to satisfy her unpaid tax liabilities.[15]

---

[15]There is a calculation error in the IET attached to the
notice of determination.  The IET shows that petitioner's monthly
disposable income is $8,618 as determined by the Appeals Office
and $12,400 as claimed by petitioner.  The IET should show that
the Appeals Office determined that petitioner's monthly
disposable income was $6,094 and that petitioner claimed monthly
(continued...)

In making her determination, Settlement Officer McHugh made several adjustments to petitioner's claimed monthly living expenses. First, she decreased the National Standards amount to $916. Second, she decreased the housing and utilities expense petitioner claimed to $1,375. She determined that according to the Cook County treasurer's office, petitioner's real estate taxes for 2006 were approximately $534 per month and that the remaining amount of petitioner's claimed housing and utilities expense was too high for the utilities.[16] Third, she decreased petitioner's transportation expenses to $327. Fourth, she disallowed petitioner's expense for life insurance because she determined that it was excessive and that petitioner had no minor children to consider. Fifth, she disallowed the $600 of credit card expenses petitioner claimed. Sixth, she decreased petitioner's monthly legal/accounting expense to $500. She based her determination regarding these expenses on petitioner's current balance as reflected on the statements petitioner submitted and on the payments already made.

_____

[15](...continued)
disposable income of $1,812. The draft IET that Settlement Officer McHugh sent petitioner's counsel reflected the correct monthly disposable income amounts. Petitioner does not argue and we do not find that this error was material to Settlement Officer McHugh's determination to reject OIC III.

[16]Petitioner did not have a mortgage on her residence.

Settlement Officer McHugh also made adjustments to the assets petitioner reported on the Form 433-A. She determined that petitioner's residence had a value of $302,523 using an appraisal petitioner submitted and using a 5-percent annual appreciation value as petitioner suggested on the Form 433-A. Settlement Officer McHugh also included the Hummer vehicle in petitioner's assets after Settlement Officer McHugh's research revealed that the Hummer was registered in petitioner's name. Although petitioner claimed the vehicle belonged to her granddaughter, petitioner never provided any verification that the Hummer was not purchased with her funds, as requested by Settlement Officer McHugh.

Settlement Officer McHugh gave petitioner the opportunity to object to her adjustments. However, petitioner's objections to the adjustments for monthly living expenses consisted of unsubstantiated statements regarding her actual expenses and assertions that her expenses should be allowed. Because petitioner did not provide substantiation of her actual expenses that would have permitted Settlement Officer McHugh to deviate from the National or Local Standards or to increase the expenses, we cannot conclude that Settlement Officer McHugh abused her discretion in making the adjustments to petitioner's monthly living expenses. We also cannot conclude that Settlement Officer McHugh abused her discretion in adjusting the value of

petitioner's residence and including the Hummer in petitioner's assets.

Aside from petitioner's financial status, Settlement Officer McHugh also considered that petitioner was still performing[17] and earning income and that her health condition was not uncommon for someone her age.  Settlement Officer McHugh did not abuse her discretion by determining that petitioner's age and health were not such extraordinary circumstances that petitioner would have suffered economic hardship if she were required to pay her outstanding tax liabilities.

Settlement Officer McHugh followed the procedures outlined in the regulations and the IRM for evaluating effective tax administration offers based on economic hardship.  We cannot conclude on the record in the levy case that Settlement Officer McHugh's findings were arbitrary, capricious, or without sound basis in law or fact.  Consequently, we conclude that Settlement Officer McHugh did not abuse her discretion in rejecting OIC III on the grounds that petitioner did not qualify for an effective tax administration OIC on the ground of economic hardship.  We therefore conclude that respondent's determination to proceed by

---

[17]Settlement Officer McHugh reviewed an article from the Chicago Tribune Sunday Magazine dated Jan. 7, 2007, stating that petitioner "still belts out her songs on stage regularly and just finished work on her 12th album."

levy with the collection of petitioner's 1998 and 2000 unpaid tax liabilities was not an abuse of discretion.

## II.  Section 6651(a)(2) Additions to Tax

Petitioner argues that respondent erred in the lien and levy case by denying petitioner's request for an abatement of penalties for reasonable cause.[18]  References to penalties in the record are to the addition to tax under section 6651(a)(2) for petitioner's failure to pay her 1998, 2000, and 2001 tax liabilities by their respective due dates.  We understand petitioner's argument to mean that she should not be held liable for the section 6651(a)(2) addition to tax because she had reasonable cause for not timely paying her tax liabilities.

Section 6330(c)(2)(B) provides that a taxpayer may raise at the hearing challenges to the existence or amount of the underlying tax liability if the taxpayer did not receive a notice of deficiency for such tax liability and did not otherwise have an opportunity to dispute the tax liability.  A taxpayer's underlying tax liability includes the addition to tax under

---

[18]At trial respondent asserted that petitioner was precluded from presenting evidence regarding reasonable cause for the sec. 6651(a)(2) additions to tax in the lien case because petitioner had an earlier opportunity to dispute her liability for the additions to tax.  See sec. 6330(c)(2)(B).  Specifically, respondent contended that petitioner received a notice of intent to levy but that petitioner orally withdrew her challenge to the proposed levy before the hearing process was completed.  However, petitioner's counsel and Settlement Officer McHugh agreed during the levy hearing that petitioner did not withdraw from the levy case, and we so find.

section 6651(a)(2).  See <u>Katz v. Commissioner</u>, 115 T.C. at 339.

Petitioner raised the issue of her liability for the section

6651(a)(2) additions to tax in both the lien and levy hearings.

We review de novo respondent's determination that petitioner is

liable for the addition to tax under section 6651(a)(2).  See

<u>Goza v. Commissioner</u>, 114 T.C. at 181.

Section 6651(a)(2) imposes an addition to tax for failure to

pay the amount of tax shown on the taxpayer's Federal income tax

return on or before the payment due date, unless such failure is

due to reasonable cause and not due to willful neglect.  A

failure to pay will be considered due to reasonable cause if the

taxpayer makes a satisfactory showing that she exercised ordinary

business care and prudence in providing for payment of her tax

liability but nevertheless either was unable to pay the tax or

would suffer undue hardship if she paid on the due date.  Sec.

301.6651-1(c)(1), Proced. & Admin. Regs.

Section 7491(c) imposes on the Commissioner the burden of

production with respect to additions to tax.  In order to meet

his burden of production, the Commissioner must come forward with

sufficient evidence that it is appropriate to impose the relevant

addition to tax or penalty.  <u>Higbee v. Commissioner</u>, 116 T.C.

438, 446 (2001).  However, the Commissioner is not required to

introduce evidence regarding reasonable cause, substantial

authority, or similar defenses.  <u>Id.</u>  Once the Commissioner meets

his initial burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. Id. at 447.

Petitioner does not dispute that she failed to timely pay her 1998, 2000, and 2001 tax liabilities and therefore respondent satisfied the initial burden of production with respect to the section 6651(a)(2) additions to tax. Petitioner argues however that she should not be held liable for the section 6651(a)(2) additions to tax because she had reasonable cause for not timely paying her tax liabilities.

Petitioner argues that two factors contributed to her inability to pay her tax liabilities timely and that those factors establish that her failure to pay was due to reasonable cause. First, petitioner claims that a bad investment in an unsuccessful club led to her failure to pay her tax. However, petitioner introduced no evidence regarding her investment in the club or how the club's failure affected her ability to pay her taxes. Because of the lack of evidence regarding petitioner's investment in the club, we cannot conclude that the investment constituted reasonable cause for her failure to pay her 1998, 2000, and 2001 tax liabilities by their respective due dates. Second, petitioner cites her poor health as reasonable cause. Petitioner introduced in evidence a letter from her physician, who has treated petitioner since 2002, describing her medical

condition during 2003 and 2004. Because the letter did not address petitioner's medical condition at the time her 1998, 2000, and 2001 taxes were due, we find it unconvincing. In addition, although petitioner's first heart attack occurred in December 2001 and left her hospitalized for over a week, she was performing again in February 2002, before her 2001 taxes were due. Petitioner did not establish that her medical bills were such that she did not have the funds to pay her tax liabilities. Petitioner presented no other evidence that her medical condition rendered her unable to pay her 1998, 2000, and 2001 taxes or that she would have suffered undue hardship if she had paid them. Although we recognize that petitioner had to deal with serious health problems in 2001 and 2003, we cannot conclude on the record in these consolidated cases that her medical problems were the reason she failed to pay her 1998, 2000, and 2001 tax liabilities or that her health problems constituted reasonable cause for not timely paying her tax liabilities.

On review of the record, we cannot conclude that petitioner exercised ordinary business care and prudence with respect to her 1998, 2000, and 2001 tax liabilities. Because petitioner has not established that her failure to timely pay her taxes was due to

reasonable cause, we sustain respondent's determination not to abate the section 6651(a)(2) additions to tax.[19]

## III. Conclusion

Both petitioner and respondent repeatedly commented on petitioner's stature as a beloved and well-known professional singer as support for their respective positions in these consolidated cases.[20] We disagree with both parties insofar as they contend that a taxpayer's celebrity status is somehow relevant to what this Court must do in deciding whether the Commissioner's collection action may proceed. Every taxpayer, no matter how famous or notorious, has a legal obligation to honestly report and pay his or her income tax liability each year and is entitled to fair enforcement of Federal tax laws. A taxpayer like petitioner whose business income is generated by performances must carefully comply with estimated tax requirements. The record establishes that petitioner had outstanding tax liabilities for 1998, 2000, and 2001 because she did not make required estimated tax payments when due and that respondent did not abuse his discretion in determining that the

---

[19]Because we conclude that petitioner has not established reasonable cause for her failure to timely pay her tax liabilities, we need not decide whether her failure was due to willful neglect.

[20]Petitioner's consolidated cases before this Court were publicized in a June 2, 2008, Forbes magazine Internet article entitled "Singing Tax Blues".

filing of an NFTL was appropriate and that respondent may proceed to collect petitioner's outstanding tax liabilities by levy. Respondent gave petitioner ample opportunity to rectify her failure to pay estimated tax when due and considered petitioner's collection alternatives in accordance with applicable administrative and legal requirements.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.